Filed 1/6/22  P. v. Padilla CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br> FRANCISCO MANUEL PADILLA,<br><br>  Defendant and Appellant. | F079471<br><br>(Super. Ct. No. VCF300758C)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

John F. Schuck, under appointment by the Court of Appeal. for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and David A. Lowe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Francisco Manuel Padilla (defendant) was charged with murder committed under special circumstances within the meaning of Penal Code section 190.2.  (Undesignated statutory references are to the Penal Code.)  He pleaded no contest to first degree murder and other crimes in exchange for an indicated prison sentence of 25 years to life and the

dismissal of additional charges. Defendant later filed motions to replace his appointed counsel (see *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)) and to withdraw his pleas. This appeal challenges the denial of those motions. Seeing no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 27, 2014, at approximately 5:35 a.m., deputies from the Tulare County Sheriff's Department were dispatched to a residence in response to a reported "home invasion in progress." They arrived to find Victor Hernandez DeHaro lying dead in a pool of blood in the driveway. One of the residents claimed to have shot DeHaro in self-defense and/or defense of others. In speaking with multiple occupants of the home, the deputies learned that additional perpetrators had fled the scene. It appeared the decedent's accomplices had dragged the decedent out of the house prior to their departure.

At approximately 5:50 a.m., surveillance cameras at an area hospital captured footage of two males carrying a third person toward the emergency department, dropping him off inside, and running back to their vehicle. The person who was dropped off, Rolando Magana, underwent surgery for gunshot injuries. Magana's companions were later identified as Edgar Picazo and defendant.

### Pretrial Proceedings

A preliminary hearing originally scheduled for June 26, 2014, was repeatedly delayed. It was finally conducted on October 15, 2015. The parties stipulated to certain facts, including the death of DeHaro from a gunshot wound to the chest. The testimony of prosecution witnesses provided the following additional information.

When deputies first arrived at the crime scene, they found "numerous fired casings" on the ground and saw bullet holes in windows and exterior walls of the house. The front door appeared to have been kicked in and was damaged, and there was a trail of blood leading to the dead body in the driveway. The decedent had gloves on his hands and a bandana covering part of his face. A search of his person yielded identification

2.

cards, an iPhone containing photographic evidence of gang affiliation, and "a magazine for a Glock handgun containing live rounds."

Four residents had been present during the home invasion: an adult male (J.R.) and his three juvenile siblings. J.R. told investigators that he was awakened by a crashing noise, he armed himself with a firearm and exited his bedroom to investigate. He reportedly encountered "two armed male subjects." Upon seeing DeHaro pointing a gun at one of his siblings, J.R. fired at DeHaro and saw him "immediately f[a]ll to the ground."

After shooting DeHaro, J.R. saw Magana enter a bedroom. Believing another of his family members was in danger, J.R. chased after Magana and exchanged gunfire with him. Both men sustained bullet wounds. When his gun ran out of ammunition, J.R. struck Magana in the head with it and retreated to his bedroom to obtain another firearm.

While in his bedroom, J.R. heard multiple intruders moving about and talking to each other. When he exited his room again, J.R. saw that DeHaro's body had been moved. Next, as stated in the preliminary hearing transcript, he went to the front door, stepped outside, and realized there were armed men located near a "Chevy Astro van." "[H]e went from there back into his bedroom and looked out his bedroom window at them. [¶] … [¶] He saw one of the suspects there holding a rifle. He said that, that subject pointed the rifle toward him and fired a shot. That round went through his window and hit him in the forearm."

J.R. and his siblings reported seeing three to five perpetrators during the incident.[1] Multiple witnesses, including a neighbor, described the getaway vehicle as a dark colored, "older model" van. Within a half hour of the incident, a security guard at a

---

[1]The People's trial brief indicated J.R.'s count of five perpetrators, including DeHaro, was the most reliable. According to the brief, "It is clear from the [hospital surveillance] video that at least one other person was involved in the crime because the brake lights to the van were already engaged before Defendants Picazo and Padilla jumped back inside [after dropping off Magana at the emergency department]."

Visalia hospital "noticed that two individuals were carrying a third individual towards the ER." The guard radioed other staff with instructions to monitor the people on hospital security cameras. The guard memorized the license plate of the van in which the subjects had arrived and provided the information to police.

Police released the surveillance footage and vehicle information to the media. Edgar Picazo's mother saw the footage on the news and recognized her son as one of the people who had carried Magana into the hospital. She also recognized the van. Due to problems the mother was having with 17-year-old Picazo disappearing for days at a time, she had gotten "into the habit of writing down license plates of cars [of] her son's friends that come over to her property." Picazo had hosted a barbeque at his mother's home on May 25, 2014 (two days prior to the subject incident), and one of his friends had driven a van with the same plates as the van in which Magana was taken to the hospital.

Magana's mother provided similar information to the authorities. She claimed to have last seen Magana two or three days prior to the home invasion. One of his friends had picked him up in a van, which she positively identified as the one seen in the hospital surveillance footage.

Further investigation revealed defendant had purchased the 1990 Chevrolet Astro van on May 23, 2014. When questioned by police, defendant admitted it was his vehicle but claimed "somebody stole the van from him." Defendant had not reported the alleged theft, and it just so happened that he and Magana were close friends. Defendant was also dating Magana's sister.

A security guard at the hospital positively identified Picazo from a photographic lineup. The same witness selected defendant's picture as a possible match but "couldn't be certain" he was the other man who helped carry Magana into the building. However, cell phone records showed defendant's phone had pinged a cell tower near the hospital at approximately 6:00 a.m. on the morning of the crime—just minutes after Magana was dropped off at the emergency department.

4.

Search warrants were obtained for the suspects' social media accounts. Investigators discovered Facebook messages exchanged among and between defendant, DeHaro, Magana, and Picazo regarding the commission of "licks" (robberies) involving "toys" (guns). According to law enforcement testimony, some messages specifically referenced "the 27th." "They said that the person had a handgun and a rifle and they were planning on hitting him in the morning when they were asleep." Victim J.R. owned a nine-millimeter handgun and an AR-15 rifle.

An expert witness testified regarding the allegedly gang-related nature of the home invasion. The expert opined that defendant, DeHaro, Magana, and Picazo were all active Norteño gang members during the relevant time period.

In September 2016, defendant, Magana, and Picazo were jointly charged with murder based on the killing of DeHaro (§ 187, subd. (a); count 1) and with attempted premeditated murder of J.R. and his siblings (§§ 187, 664; counts 2–5).[2] They were also charged with discharging a firearm into an inhabited dwelling (§ 246; count 6); attempted home invasion robbery (§§ 211, 213, subd. (a)(1)(A), 664; count 7); assault with a semiautomatic firearm (§ 245, subd. (b); count 8); and first degree burglary (§ 459; count 9).

---

[2]The People's trial brief explains count 1 was based on the provocative act doctrine. "When someone other than the defendant or an accomplice kills during the commission or attempted commission of a crime, the defendant is not liable under felony-murder principles but may nevertheless be prosecuted for murder under the *provocative act* doctrine." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654.) This theory "requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*Id*. at p. 655.) "When the defendant or surviving accomplice acts in such a manner and the third party kills in response, the provocateur can be said to have proximately caused the resulting death notwithstanding the intervening use of deadly force by the third party." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 603.) Depending on whether a defendant acted with express or implied malice, the provocative act doctrine "may support either first or second degree murder." (*Gonzalez*, at p. 655, fn. 9.)

Count 1 included special circumstance allegations of murder occurring during the commission or attempted commission of robbery and/or burglary. (§ 190.2, subd. (a)(17)(A), (G).) Gang and firearm enhancement allegations were included in all counts. The attempted murder counts were alleged to be gang related such that each offense was punishable by a prison term of 15 years to life. (§ 186.22, subd. (b)(5).) Defendant was further alleged to have suffered a prior strike and prior serious felony conviction. (§§ 667, subds. (a)(1), (b)–(i), 1170.12.)

Defendant pleaded not guilty to all charges. Due to a series of delays, the case did not go to trial until August 22, 2018.

### Trial/Change of Plea Proceedings

On the morning of trial, the judge asked the parties, "[I]s this a[] [life without the possibility of parole] case?" The prosecutor responded affirmatively. The judge then asked if there had been "any settlement discussions about pleading to life with parole?" The prosecutor replied, "The only discussions that have been had or offers that have been made have been determinate terms that the People were not willing to accept at that point."

During a subsequent colloquy, the trial court stated, "Quite frankly, the way you should resolve it, I think they should all three plead to first [degree murder]. I don't know if anybody has talked about that or even considered it." The trial court opined the People appeared to have "a pretty rock-solid case" and then briefly summarized its understanding of the evidence.

A recess followed, which the trial court later estimated to be over two hours long. When the proceedings resumed on the record, the judge said, "Gentlemen, I have been informed by your counsel that you wish to resolve this matter, and I can tell you I think that is a very smart move on your part because the evidence I believe is pretty overwhelming. [¶] … [¶] You're going to plead to several of these charges. I told your lawyer[s] I'm going to let the [prosecutor] put on the record what I think is right, what

6.

they think is right, and what the appropriate case should be. But bottom line is I intend to sentence you all to 25-years-to-life in prison."

The trial court noted defendant's plea bargain included the resolution of a separate case. While awaiting trial in the present matter, defendant was charged in Tulare Superior Court case No. VCF356923A (VCF356923A) with possession of a weapon in a penal institution (§ 4502, subd. (a)). The incident had occurred in July 2017.

The parties did not execute written plea agreements. The trial court verbally provided a standard advisement of rights and elicited the necessary acknowledgements and waivers. All parties stipulated to a factual basis for the pleas based upon the preliminary hearing transcript and "police reports."

Defendant pleaded no contest to counts 1, 2, 3, 4, and 5, as well as to the charge in VCF356923A. He admitted, by a response of "no contest," the commission of murder alleged in count 1 "was willful, deliberate, and premeditated." He also admitted the truth of the relevant gang and firearm enhancement allegations. Pursuant to the terms of the plea agreement, counts 6, 7, 8, and 9, as well as the special circumstance allegations for count 1, were to be dismissed at the time of sentencing.

The trial court stated its intention to strike/dismiss the prior strike and prior serious felony conviction allegations. Accordingly, defendant was not asked to admit the truth of those allegations. The trial court found defendant's pleas were "freely and voluntarily made with an understanding of the nature of the charges [and] consequences of the plea." The matter was then "referred to Probation with an indicated sentence of 25-years-to-life."

### Postplea Filings

On October 26, 2018, the trial court issued an amended minute order for the change of plea hearing to formally state its intention to strike the prior strike and serious felony conviction allegations for all counts.

7.

Sentencing was originally scheduled for November 28, 2018. However, on that date defendant filed a handwritten letter with the trial court. The letter read, in pertinent part:

> "Let the record reflect: My name is Francisco Padilla. I am speaking on my own behalf due to the fact my lawyer does not adhere to any requests that I have made which I believe are my constitutional rights.
>
> "I do not feel comfortable with taking the current 'deal' presented by this court nor have I ever felt comfortable doing so.
>
> "I wish to withdrawl [sic] my plea and in doing so, file a 'Marsden' Motion.…
>
> "From the beginning of my incarceration the Tulare County Sheriff[']s Dept. and their division and even my own [illegible] have demoralized me and my image and through said scrutiny and negative spotlight, in a sense, has lead me to believe there's no alternative but to except [sic] defeat and take this plea bargain. Even now after four years I have yet to see my full discovery which is why I withdrawl [sic] my plea and wish to submit the following reasons:
>
> "• My lawyer has never provided me with any type of discovery or taken the time to get with me and examine evidence or talk about defense after advising me we would do so on (3) three occasions; with negative results.
>
> "• My lawyer has not touched basis [sic] with me about 'S·B 1437' after requests on my part which I believe my/our case falls under.[3]
>
> "• According to the judge our plea 'deal' was (25) years to (life). Nothing less. Nothing more. Now the D·A is attempting to interfere and not strike my strike as agreed and tack on an additional (5) years to said sentence which violates the plea bargain I and others have agreed to. I feel like Im being decieved [sic].
>
> "I would like this court and the record to reflect that this is a conscientious decision and wish to Withdrawl [sic] my previous plea and file a 'Marsden' Motion." (Italics added, some capitalization omitted.)

---

[3]Defendant's statement regarding "S·B 1437" presumably related to Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). Senate Bill 1437 changed the law of murder by abrogating the natural and probable consequences doctrine and restricting the scope of the felony-murder rule. Appellate courts have consistently held that Senate Bill 1437 did not eliminate the provocative act doctrine, and section 1170.95 affords no relief to defendants convicted under the provocative act doctrine. (E.g., *People v. Mancilla* (2021) 67 Cal.App.5th 854, 867–870; *People v. Johnson* (2020) 57 Cal.App.5th 257, 261, 271.) We need not discuss this topic further because defendant's appeal raises no issues concerning Senate Bill 1437.

Possibly due to the filing of defendant's letter (it is unclear from the record), the sentencing hearing was rescheduled for January 2019 and ultimately pushed back to May 14, 2019. On May 1, 2019, defendant filed handwritten notices of motions and moving papers regarding his *Marsden* request and desire to withdraw his pleas. The contents were largely repetitive of the assertions made in the November 2018 letter. This time, however, defendant also alleged the existence of an alibi witness, and he accused defense counsel of "constitutionally inadequate representation" for, inter alia, failing to "investigate and produce alibi witnesses" and failing to "explore and present evidence on diminished capacity."

### *Motion Rulings and Sentencing*

On May 14, 2019, the trial court heard defendant's motions, denied them, and then proceeded with sentencing. Pertinent transcript excerpts from the motion hearing are as follows:

> "[THE COURT:] You say your lawyer failed to adhere to your request[s], which you believe are your constitutional rights. [¶] What requests are those?
>
> "[DEFENDANT]: My full discovery. I had a key—a key witness for my alibi. The information—I haven't been able to get in contact with him. I know his last name is Mr. Martinez. During the time of the incident, I was in his house.
>
> "THE COURT: You are on videotape, sir, at the hospital.
>
> "[DEFENDANT]: That's allegedly. [¶] Even the security officers, they don't even positively identify me as the person carrying whatever they say. [¶] That, and I want an expert, an identity expert so they can show— like, there's a lot of people that can resemble my height, my weight, even my appearance. Not literally my face structure and everything, but the camera's distorted. I seen the picture when the detectives came to me, but it is not me.
>
> "THE COURT: [Addressing defense counsel] Did you see his declaration? [¶] Did you want to respond to any of these [statements], [counsel]?

"[DEFENSE COUNSEL]: It is true he hasn't received all of his discovery. I did send some discovery over to him. Not every piece of discovery has been sent. I know I had delivered over 500 pages of discovery. The extensive part of discovery, which the gang packet, which I did not provide to him, but I believe all the relevant police reports were turned over to him.

"THE COURT: About the shooting and the home invasion robbery?

"[DEFENSE COUNSEL]: They were.

"[DEFENDANT]: It was a poor report. It don't even mention my name or anything about, like, how they are linking me. All they say is by a picture and the registration.

"THE COURT: Tell me about the alibi witness. [¶] What were your thoughts there?

"[DEFENSE COUNSEL]: Well, it didn't turn up to be fruitful. We went and looked for them.

"[DEFENDANT]: I didn't talk to them.

"THE COURT: Sir, I'll give you a chance to respond, but please don't interrupt him.

"[DEFENSE COUNSEL]: It appeared that the evidence was somewhat overwhelming as to the identification as to [defendant]. We weren't able to flesh out any of the information about the alibi witness. [¶] And actually, the alibi witness was brought to my attention, I believe, afterwards.

"THE COURT: After the plea?

"[DEFENSE COUNSEL]: I believe so.

"THE COURT: What did you want to say, [defendant]?

"[DEFENSE COUNSEL]: I may be incorrect, but I think that was the indication.

"[DEFENDANT]: After the plea, that was like the last thing we talked about. I didn't even—we didn't talk after that. Like—like you sent your investigator a couple of times, but that was it. [¶] He wasn't really trying to hear me out. He was just like oh, no, it cost too much to do this or do that.

10.

"THE COURT:  You also declare that he deceived you as to additional charges that were not—

"[DEFENDANT]:  Yeah, well, the DA, when they were reading out our charges, like she tacked on a different charge.  My co-defendant pointed it out."

We omit the exchange regarding the alleged "different charge" for two reasons. First, defendant has abandoned the issue by not raising it in his appellate briefs.  (See *People v. Stanley* (1995) 10 Cal.4th 764, 793; *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 538 [failure to brief an issue on appeal "constitutes a waiver or abandonment of the issue"].)  Second, the allegation is wholly unsupported by the record.

The hearing continued with the trial court stating its recollection of certain events:

"THE COURT:  I remember exactly what happened.  It was the first day of trial. We were going to be picking a jury, and I made a comment that the case ought to settle, and that is when all three defendants went into the room together with all three defense lawyers and just sat down for two hours—two-plus hours, and followed up on the Court's recommendation as to a proposed resolution ….  [I]t could have gone very bad for [defendant], as well as the other co-defendants, and the fact that they have a possibility of parole now was a major win I would say or a major benefit for the defense in this case and quite frankly, I don't think a jury would have ever have provided to the defendant, had the matter gone to trial.  [¶] I agree with you, [defense counsel].  I thought the evidence from what I saw was overwhelming.  They got the defendant on video dropping the body off at the hospital.

"[DEFENSE COUNSEL]:  I felt there was enough compelling evidence in [assessing] the risk of going to trial.  And I informed [defendant] of that in our conversations being very frank when it is a co-defendant matter like this, and the offers are made in package or in concert together with all the defendants, many times, when all three defendants were in the room talking to the attorneys, we try to answer as many of the questions that they have before ever even providing any advice of what we think.

"I remember during that conversation that we gave—I felt we gave all three defendants the best possible opportunities to ask any questions they want to of ourselves and tried to answer them as honestly as possible.

"THE COURT:  All right.  Anything else you want to tell me, [defendant]?

"[DEFENDANT]:  Well, just I don't see how you guys can place me at the hospital.  Like, you guys are sure that it is me when people, like the security guards and the witness, don't even point me out.

"THE COURT:  All right.  The *Marsden* motion is denied, as well as the motion to withdraw the plea is denied.  [¶] Let's get everybody else in here and we'll proceed with sentencing."

Defendant was sentenced according to the terms of the plea agreement.  The trial court imposed a prison sentence of 25 years to life for the conviction of first degree murder.  Concurrent sentences of 15 years to life were imposed for the four convictions of attempted premeditated murder.  A concurrent two-year sentence (the mitigated term) was imposed for the conviction in VCF356923A.  Punishment for the enhancements was stayed.

On or about June 17, 2019, defendant filed a handwritten notice of appeal.  In November 2019, this court granted permission for defendant to belatedly request a certificate of probable cause from the trial court.  In December 2019, the trial court granted defendant's request for a certificate of probable cause.

## DISCUSSION

### I.     Motion to Withdraw Pleas

"When a criminal defendant enters a guilty plea, the trial court is required to ensure that the plea is knowing and voluntary."  (*People v. Cross* (2015) 61 Cal.4th 164, 170.)  The defendant "must understand the nature of the charges, elements of offenses, pleas and defenses which may be available and punishment which may be expected before a trial judge accepts his waiver and plea."  (*People v. Hunt* (1985) 174 Cal.App.3d 95, 103.)  When those requirements are met, "pleas resulting from a bargain should not be set aside lightly and finality of proceedings should be encouraged."  (*Ibid.*)

12.

The withdrawal of a guilty or no contest plea requires a showing of good cause, which must be demonstrated by clear and convincing evidence. (§ 1018; *People v. Cruz* (1974) 12 Cal.3d 562, 566; *People v. Waters* (1975) 52 Cal.App.3d 323, 328.) "'Good cause' means mistake, ignorance, fraud, duress or any other factor that overcomes the exercise of free judgment." (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 917.) "The defendant must also show prejudice in that he or she would not have accepted the plea bargain had it not been for the mistake." (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1416; accord, *In re Alvernaz* (1992) 2 Cal.4th 924, 934 [where deficient representation is alleged, defendant must show "a reasonable probability that, but for counsel's incompetence, [he/she] would not have pleaded guilty and would have insisted on proceeding to trial"].)

"A plea may not be withdrawn simply because the defendant has changed his mind." (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1456.) "The fact that [the defendant] may have been persuaded, or was reluctant, to accept the plea is not sufficient to warrant the plea being withdrawn." (*People v. Ravaux*, *supra*, 142 Cal.App.4th at p. 919.) Likewise, "[p]ostplea apprehension regarding the anticipated sentence, even if it occurs well before sentencing, is not sufficient to compel the exercise of judicial discretion to permit withdrawal of the plea." (*People v. Hunt*, *supra*, 174 Cal.App.3d at p. 104.)

"When a defendant is represented by counsel, the grant or denial of an application to withdraw a plea is purely within the discretion of the trial court after consideration of all factors necessary to bring about a just result." (*People v. Shaw* (1998) 64 Cal.App.4th 492, 495–496.) On appeal, the ruling "will be upheld unless there is a clear showing of abuse of discretion." (*Id*. at p. 496; accord, *People v. Fairbank* (1997) 16 Cal.4th 1223, 1254.) "Moreover, a reviewing court must adopt the trial court's factual findings if substantial evidence supports them." (*Fairbank*, at p. 1254.) "We neither reweigh the

evidence nor reevaluate the credibility of witnesses." (*People v. Jennings* (2010) 50 Cal.4th 616, 638.)

Defendant argues his motion should have been granted on the basis of his claimed alibi and because he pleaded no contest "without having reviewed all of the discovery in the case." Regarding the alibi, defense counsel represented that the issue was not even raised until after the no contest plea had been entered. Defendant did not deny this. He merely alleged that "[a]fter the plea," the purported alibi "was like the last thing we talked about."

The People observe defendant was necessarily aware of the alleged alibi when he pleaded no contest. The change of plea occurred on the first day of trial, yet defendant had apparently kept the information to himself during the four years since his arrest. We further note the alibi was not mentioned in defendant's handwritten letter of November 28, 2018, which was filed on the original sentencing date. It was not until May 2019, more than eight months after he had pleaded no contest, that defendant raised the issue in connection with his request to withdraw the plea.

"[I]n determining the facts, the trial court is not bound by uncontradicted statements of the defendant." (*People v. Hunt*, *supra*, 174 Cal.App.3d at p. 103.) The trial court may "take into account the defendant's credibility and his interest in the outcome of the proceedings." (*People v. Ravaux*, *supra*, 142 Cal.App.4th at p. 918.) The denial of defendant's motion implies a credibility determination and a finding that no mistake, ignorance, or any other factor relating to the supposed alibi affected defendant's decision to accept the plea offer. The record adequately supports those implied findings.

Furthermore, defendant failed to allege the required element of prejudice. (Cf. *Hill v. Lockhart* (1985) 474 U.S. 52, 53 ["petitioner failed to allege the kind of prejudice from the allegedly incompetent advice of counsel that would have entitled him to a hearing"], 58 ["we believe that requiring a showing of 'prejudice' from defendants who seek to challenge the validity of their guilty pleas on the ground of ineffective assistance

14.

of counsel will serve the fundamental interest in the finality of guilty pleas"].) By failing to make any showing that he "would not have accepted the plea bargain had it not been for" factors related to the alibi, defendant did not carry his burden to present "clear and convincing evidence" of good cause for the withdrawal of his plea. (*People v. Breslin*, *supra*, 205 Cal.App.4th at p. 1416.)

Defendant fares no better with his discovery argument. First, the discovery claim contradicted his representations at the change of plea hearing. He had answered "Yes" when the trial court asked, "[H]ave you had enough time to talk to your lawyer and are you satisfied with [his] services?" Second, defendant has still not alleged or explained how the receipt of his "full discovery" would have changed his decision to accept the plea bargain.

Defendant attended the preliminary hearing and was willing to enter into the plea agreement with the knowledge of the evidence presented therein. Nothing in the record suggests the discovery disclosed by the People, which was itemized and listed in the People's trial brief, contained exculpatory information. In his motion papers, defendant complained, "I have yet to see my full discovery and know for a fact that any victim's or eye witness positive [*sic*] point me as the suspect." However, the People never claimed to have such definitive proof.

The law enforcement witnesses at the preliminary hearing conceded (1) the hospital security guard did not positively identify defendant from the photographic lineup and (2) the surveillance footage only depicted someone whose "size and stature was consistent with [defendant]." Defendant acknowledged this during the motion hearing and indicated he was shown the surveillance video at or near the time of his arrest.

Again, the no contest plea was entered on the first day of trial. Defendant had been in custody awaiting trial for approximately four years. It is reasonable to infer that if defendant had questions or concerns regarding the strength of the People's case, he would have raised them before changing his plea. But when the trial court asked if he

was afforded enough time to consult with his lawyer and was satisfied with counsel's performance, he responded affirmatively. We thus conclude the motion was appropriately denied.

## II.     Marsden Motion

### A.     Standard of Review

"The denial of a *Marsden* motion is reviewed on appeal for an abuse of discretion." (*People v. Loya* (2016) 1 Cal.App.5th 932, 944.)  If the motion was erroneously denied, we apply the harmless error test described in *Chapman v. California* (1967) 386 U.S. 18.  (*Loya*, at p. 945.)  "Under that standard, we must ask whether the denial was harmless beyond a reasonable doubt."  (*Ibid.*; see *People v. Winn* (2020) 44 Cal.App.5th 859, 871 [trial court's erroneous denial of *Marsden* motion without conducting a further inquiry held "harmless beyond a reasonable doubt" because evidence of appellant's guilt was "overwhelming"]; *People v. Knight* (2015) 239 Cal.App.4th 1, 9 ["*Marsden* does not establish a rule of per se reversible error"].)

### B.     Law and Analysis

"'""""When a defendant seeks to discharge appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.""""' [Citations.]  '"[S]ubstitution is a matter of judicial discretion.  Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel." [Citations.]'" (*People v. Valdez* (2004) 32 Cal.4th 73, 95.)

"[A] *Marsden* hearing is not a full-blown adversarial proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement." (*People v. Hines* (1997) 15 Cal.4th 997, 1025.)

Defendant again relies on his claimed alibi and the discovery issue. Regarding the alibi, criminal defense attorneys have a duty to make reasonable investigations into potentially exculpatory evidence. (*In re Edward S*. (2009) 173 Cal.App.4th 387, 407.) The investigative efforts need not be exhaustive and the threshold for effective assistance will depend on various factors such as the strength of the prosecution's case. (*Strickland v. Washington* (1984) 466 U.S. 668, 680-681; see *In re Andrews* (2002) 28 Cal.4th 1234, 1254, 1256-1257.)

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 691.)

The trial court satisfied its procedural obligations by allowing defendant to state his complaints and questioning defense counsel regarding the same. (*People v. Smith* (1993) 6 Cal.4th 684, 696.) "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.'" (*Ibid*.) Relevant considerations included the fact defendant waited four years to allege the existence of an alibi witness and inexplicably withheld the information from defense counsel until after his acceptance of the plea bargain. Even then, defendant could only identify the witness as "Mr. Martinez." Defense counsel represented that he investigated the alibi and was unable to substantiate it. Under the circumstances, it was within the trial court's discretion to accept counsel's explanation and conclude deficient performance had not been shown.

With regard to the discovery issue, we again note the contradiction between defendant's statements during the change of plea proceedings and the complaints he made three months later. As of the morning of trial, defendant had raised no concerns

regarding counsel's furnishing of discovery material. He affirmatively stated his satisfaction with counsel's performance prior to changing his plea. Therefore, despite the attorney's concession that defendant had not received all of the available discovery, the record supports the implied finding there was no irreparable breakdown in the attorney/client relationship and defendant was attempting to manufacture grounds for the withdrawal of his plea. (See *People v. Smith*, *supra*, 6 Cal.4th at p. 696 ["a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict"].)

Even assuming deficient performance was shown based on the discovery issue, any error in denying the *Marsden* motion was harmless. As noted, the *Marsden* claim was first asserted on the original sentencing date. Sentencing was then postponed until the *Marsden* motion and the motion to withdraw the pleas were both ruled upon. Pursuant to our earlier discussion, the discovery issue did not establish good cause to grant the motion to withdraw. Had the *Marsden* motion been granted, the role of substitute counsel would have been limited to the sentencing phase. Because defendant was sentenced according to the plea agreement, it is clear beyond a reasonable doubt that the outcome of the case would have been the same.

## DISPOSITION

The judgment is affirmed.

PEÑA, J.

WE CONCUR:

FRANSON, Acting P. J.

SMITH, J.

18.